Good morning. May it please the Court, Joseph Seguenza for Petitioner this morning. This immigration case, Your Honors, deals with the issue of whether there is substantial evidence on the record to support an adverse credibility finding, and that Petitioner was not statutory. I want you to wait just for a minute until everybody clears out. We'll give you we don't want you to be distracted. Go ahead. Thank you. The issue this morning involves whether there is substantial evidence on the record to support the Court's finding of an adverse credibility finding, rather, and that Petitioner was not statutorily eligible for asylum, withholding or removal, and relief under the Convention Against Torture. Petitioner submits that on four grounds there was error, and that substantial evidence does support the fact that he was persecuted because of his imputed political and or religious opinion, and that he did testify in a forthright, credible manner. We'll give you With respect to the adverse credibility finding, the record or, rather, the IJ does not cite specific examples on the record or specific cogent reasons for a finding of adverse credibility. I believe the Court simply stated that Petitioner was evasive or nonresponsive without citing specific examples in the record, and I believe that that fails the test of credibility determination as established by this Court. Petitioner submits that he was quite consistent in his testimony in establishing persecution as a result of his involvement in an intelligent or intelligence organization that was reportable to the Prime Minister in India. He testified specifically as to his training, the length of time that he was involved in the RAW, his compensation, the name of two of his superiors, the names of at least two subjects of inquiry that he engaged in, which he engaged in investigation. And we would submit that this satisfies credibility finding or that Petitioner was, in fact, credible when he testified at the regular hearing. With respect to the organization itself, I believe the IJ or the Court concluded that because there was no corroborating evidence of the existence of this agency or organization, that it was very difficult to corroborate Petitioner's credibility. Submitted that his credibility was established and that there is no need for corroborating evidence in that regard, especially given the fact that this is in the nature of a secret organization, similar to the CIA in this country, and that it would be difficult or even extremely burdensome for Petitioner to attempt to submit documentation in that respect, proving the existence of the organization. Counsel, is there information as to which we can take judicial notice that this organization exists? Admittedly, Your Honor, we don't know of any, frankly. But we would submit that it would be speculation to conclude why organizations such as Human Rights Watch or Amnesty International or State Department reports do not mention the existence of this organization. It's not to say that it doesn't exist, but it would be speculation or conjecture as to why it doesn't show up in documents such as those provided by Human Rights Watch or Amnesty International or even the Department of State, rather. Have you made any effort to locate it through the Internet? Your Honor, I believe attempts were made. I don't have any positive proof, if you will, of the existence of this organization through that meeting. I ask that because we fairly easily located information about it. I'm sorry? We fairly easily located a lot of information about it. Through the Internet. Well, one way or another. It wasn't the — it wasn't — didn't take very long. So you just didn't do very much, I think. Well, in terms of the existence of the organization, granted, I didn't — No, but I — were you counsel in the immigration hearing? No, Your Honor. Whoever was the counsel didn't do very much. We were counsel on appeal. Oh. On appeal, you didn't do very much. Well, moving on to two other grounds of decision by the I.J., the I.J. concluded that the work that the Petitioner engaged in with this agency constituted either persecution of his subjects due to the nature of the work of the agency, or it was aiding and abetting in terrorist activities or terrorist organizations. We feel that the I.J.'s — we submit that the I.J.'s conclusions are unfounded. The Petitioner had testified in — at the regular hearing, rather, that he was unaware of the exact nature, if you will, of the organization until later on in his career. Well, didn't he realize that people were being eliminated? Well, the record does not establish that, Your Honor. I don't believe. He states that, quote, bad things did happen to these people, but there's no evidence in the record as to what he meant by that. It wasn't explored. Do you need more than that, bad things? Well, submitted, Your Honor, I believe that bad things could mean a number of things, anywhere from beatings to simple detention to — to more than that. And unfortunately, it was not explored on the record. And then didn't he help the terrorists? Pardon me? Then he admitted to helping the terrorists. Well, I believe that's a matter of interpretation also of his testimony and the other evidence. Well, that's the way it was interpreted. It was interpreted by the — by the I.J. in that fashion. Submitted that — What's wrong with that? The way that Petitioner testified, and given the other evidence in the record, it's submitted that he held a certain belief as to Khalistan. He was a Sikh. And he did advocate peaceful means of acquiring the state of Khalistan. However, he did not obey his superior's orders in requesting or commanding him, instructing him to engage in a fake encounter of a particular subject toward the end of Petitioner's career simply because the Petitioner's findings, if you will, on investigation, showed to him that this person was a peaceful advocate of Khalistan rather than someone who engaged in terrorist activity or advocated violent means for the creation of Khalistan. Is that clear, you think, that he only helped peaceful advocates of Khalistan? I'm sorry, Your Honor? You say the evidence shows he only helped peaceful advocates of Khalistan. Yes. I believe there is one — one excerpt in the record where the I.J. had inquired or rather the government had inquired whether or not he had provided information about roadblocks to — to people who advocated violent means. His whole point in testifying in that regard was that he was trying to save lives. And it wasn't a situation where he was actually engaged in terrorist activity or that he was advocating terrorist activity or terrorist organizations. No. But the test is whether he helped terrorists. He submitted that it's not necessarily helping terrorism. It's trying to save lives. No, no. The statute talks about a ban on people who help terrorists, not terrorism. Yes. I believe the statute says providing material support. And I believe one of the ways of providing material support — Did he provide material support on his own testimony? We — we submit that he did not. He did not engage in terrorist activities, and he did not advocate terrorist activities. His sole purpose in providing information to individuals that he testified to in deposition was simply to — to save lives. Well, that's what he testified to. Actually, I've been helping internally these terrorists, which the government calls them terrorists. I don't call them terrorists. What do you mean helping? I used to give them the information alerting them that they should not go to such and such a place and to such and such a road. Certainly, Your Honor. And — And he said, are you aware that they're implicated in terrorist bombings? His answer, yes, they have to do those things. His — his testimony establishes that he did not agree with the government that these people were, in fact, terrorists. That — that could be a reasonable interpretation. He came to — he came to find out toward the end of his career that the government was engaging in some form of persecution against those who advocated the State of And I believe that that's a reasonable interpretation of his testimony. Well, when he says what was just read, they have to do these things, that seems to refer to bombings, doesn't it? I believe that the record did not go into further detail, unfortunately, as to — But as far as it went. Pardon me? As far as the record went, it's a reference to bombings, and he says they have to do these things. I believe he also testified, Your Honor, that he believed in those who would lay down their lives for Khalistan. That doesn't necessarily advocate, I would submit — That doesn't, but the bombings does. I think the difference drawn here is not that he was advocating the bombings, but if — but he's ineligible if he materially assists terrorists. And if they're committing bombings, they might fall under that category. So how do you respond to that? Granted. Again, the record did not go into further details as to whether or not he believed that he was advocating people or organizations who engaged in terrorist activities or who were labeled terrorists. He believed that the government's labeling of terrorists ran contrary to his beliefs. He believed that, especially with the subject that he refused to engage in a fake encounter upon, that person he believed was a peaceful advocate of Khalistan. And the government ordered him to engage in a fake encounter because they labeled him as a terrorist. And that's the subject of — or that's the point of reasonable interpretation or difference of opinion. You're a little over your time, but we'll give you some time for rebuttal. Thank you. Let's hear from the government. May I please the Court? My name is Jennifer Levings. I represent the Attorney General in this matter. So according to the Attorney General, does this organization exist or not? Your Honor, I think the testimony at trial was that it's — this organization is not. You see, here's the problem I have with that. You know, or at least your clients know, whether this is true or not. And we're going to look pretty silly if we issue an opinion that says, oh, no, this agency doesn't exist, when, in fact, it may. Well, Your Honor, I don't believe that this case turns on whether the agency, in fact, exists. The problem was the Petitioner has a burden. Counsel, look at what the BIA turned its opinion on. What the BIA turned its opinion on was that the Petitioner didn't provide enough evidence. He didn't provide evidence that the — that Ra exists, nor did he provide any evidence that, even if it did exist, that he was a member, that he worked for Ra. The evidence varies. Right. We're just on the first point, though. I mean, if — I think it would be — I mean, it's not unusual for — in these kind of cases, for someone to approach an immigration hearing without sufficient documentation on certain things. So I'm asking you, as a representative of the Attorney General, does this organization exist or not? I mean, you — I did not look into that because that's not a question. The evidence did not come to the Court. You didn't look into it at all, is that right? Your Honor, it probably does exist. I don't work on these cases. I'm asking you directly. Did you look into it? I did not look into it. The government's position is that that's not an issue in this case. The issue in the case is whether Petitioner presented enough evidence to support his claim of asylum. Before the board — before the immigration judge — Right. And the INS counsel at this time, they're — I'm sure this Court is well aware they are not extremely well-versed in every aspect of terrorist case. They just take case after case. So in this case, it's pretty clear that neither the INS counsel or Petitioner's own attorney was — presented any evidence on Ross. So the problem in this case — No, I understand your general position, which is nice and neat and technical on the burden of proof. But in the real world, if this — if, in fact — and this organization, I think, by all indications, exists. Then we look pretty silly. I think the BIA looks pretty silly by saying, well, no, it doesn't exist, and therefore he's incredible. Because that's what the BIA — The board didn't say — the board did not say it didn't exist. The board said Petitioner didn't provide any evidence of its existence. And that's — that's what this case hinges on, is it's the applicant — the asylum applicant's burden in this case to present evidence that, one, the agency exists, and, two, that he worked for it. He provided very sketchy details. Well, he testified he worked for it. He testified the people he worked for. He testified what they told him to do and why he did and didn't. I don't think — perhaps he would have thought he'd have to prove that it necessarily existed. Well, the immigration judge was not aware that RAW existed, and the burden is not on the government to prove that. So the immigration judge was looking to Petitioner to show him some evidence. Because his testimony was so sketchy as to whether he even worked for an organization and what Petitioner's testimony was, was that he worked for this organization for 13 years investigating Sikh terrorists, and that he didn't realize that that's what he was doing, although he was recruited because — specifically because he himself was a Sikh and could get access to these people. He testified that he worked for 13 years, investigated at least 30 to 40 people, and oftentimes his investigations of those people ran for months at a time. He lived with some of them, and he could only name one other person other than the one involved, the sodie who's involved in the actual allegation of persecution, only one other individual in 13 years that he actually spied on. So the problem with this case — Counsel, if you look at the transcript, the questioning doesn't quite go that way. He did supply some specific names. He only supplied one, Your Honor. The other names were names that the INS counsel asked him if he recognized. And those were actually very high-level terrorists, somebody who was working in a terrorist cell, as Petitioner claimed, should have known those names. And INS counsel pointed that out when he questioned Petitioner on those names. And Petitioner only recognized one, and he said he just happened to meet him at the Golden Temple on a random encounter. But didn't — and the other one, he testified he didn't believe he was a high-level terrorist and had never heard of him because he would have. And these were names that were included in the documentation presented to the immigration judge. So all of these things go to the immigration judge and the Board's decision that Petitioner just didn't present enough evidence to support his claim that RAH existed and that he worked for it. He's even got a secret mailing address that he mails things to at the prime minister's office, although he addresses them directly to the director of RAH. And then he says, well, that's, you know, if you called the prime minister, you couldn't get that information. I mean, his claim is just very unbelievable. And the Board just simply did not believe the tale. And what we're saying here is we don't want asylum applications to — applicants to be able to come in, claim that they work for a secret organization, and present no documentation, present no evidence that they actually worked for this organization.  It would all be — that argument would all be fine if the Board hadn't just pegged its decision on the non-existence of RAH. That's not the only reason, Your Honor. Well, show me where else in the Board's decision, not the immigration judge's, because in this case we reviewed the Board's decision. Yes, Your Honor, we do review the Board's decision. Right. The Board listed out — he did not prove that he — he only listed one person that he was able — that he spied on in a career of 13 years. And along with it, he didn't know the true nature of RAH until the very end of his career. He didn't know that they were seeking out Sikh terrorists. I mean, the Board just thought it was unbelievable. His claim in itself was unbelievable. Well, it seems to me what he was testifying to is he didn't understand that they were setting up and assassinating him until the end. That's what he said in his testimony, didn't he? I'm sorry, Your Honor. He understood that he was spying on Sikhs and providing information. But he — I gather, I mean, from reading his testimony, what he's saying is that he thought that he was just providing information on terrorists. He didn't understand, according to his testimony, that he was — they were being set up to be assassinated until the last minute. Your Honor, I don't believe that that's an adequate characterization of his testimony. He testified that he — and after much prodding, much repeated questioning on the subject, he testified that he did know that the people that he turned in to his superiors disappeared within 10 to 15 days and that bad things happened to them. This wasn't something he said he discovered at the end. What he discovered at the end was that Sikhs were being targeted. I mean, his testimony is pretty contradictory in that aspect, that, yes, he did know — he's very evasive on, yes, he did know what his bosses were doing with this information. And he said that he was not responsible for setting up these encounters. He just took the person to the location, and the police were the ones who enacted the encounter. So this was something that happened repeatedly that he was aware of. And his testimony at the end, that he just didn't realize this until the last year of his 13-year career, just was not believable to the Board. And again, Your Honor, the government submits that the evidence here just does not — does not show that Petitioner met his burden. And his burden was to show the existence of RAW, which, if it was like the CIA, which he claimed, and other international spy agencies, he should have been able to come up with something on that for the immigration judge, because that's the person he needs to convince, as well as before the Board, who looks at what was before the immigration judge. And Petitioner certainly didn't show substantial evidence that he actually worked for this organization. His evidence was extremely sketchy. And again, he was able to remain in India for a year after he was supposed — after he supposedly left RAW. He said he stayed with family and friends, and he was able to evade RAW because he knew their techniques. He was able to leave on his own passport. So this shows that this large government agency that he says is the biggest agency in India, directly under the prime minister, nobody can — there's no judicial review over it, that they couldn't even go to his friends' houses and his relatives' houses to find him. Those are the things that the Board looked at and just didn't believe that Petitioner presented enough evidence to support his claim of persecution. Accordingly, the government submits that Petitioner did not establish past persecution. He's not — he did not establish a well-founded fear of future persecution, and the Court should affirm the Board's decision. Did he make any cat claim? Not before the immigration judge. He did in a motion to remand before the Board requests cat consideration. They denied the motion to remand. They then did deny cat. They went ahead and considered on their own de novo and said that he had not met his burden on cat of showing that it was more likely than not that he'd be tortured. And that evidence is — is sustained by the record before the immigration judge and the Board. Is the cat issue before us? The cat issue would be before you, Your Honor, because the Board did address it on their own. If they hadn't, then it wouldn't, but they did throw in a paragraph saying that he hadn't met his cat claim burden. And in this case, Petitioner hasn't shown that if he returns to Utrecht Pradesh where he lives, that he will be persecuted either because he was a former member of — of RAW or because he was a Sikh. He seems to have raised that claim in his petition for review, that because he's a Sikh, he will be subject to torture. And that's not borne by the evidence of record, the State Department reports, or any of the information that Petitioner himself presented, that he will be, if he returns to Utrecht Pradesh where he lives, that he will be singled out for torture more — that he will more likely than not be singled out for torture. In fact, even in the Punjab, things seem to have steadied out and — and Sikhs are not — are not persecuted the way they were in 1991 and 1992. Is that in the record in the country conditions? Yes, Your Honor. I believe that the — at page 171, the 1996 country reports talks about the fake encounter killings that seemed to occur in 1992 in the Punjab. No such encounter killings happened in 1993. The addendum — the addendum says — What's your reference in the excerpts of record? The administrative record. What's your reference in the administrative record? I'm sorry, Your Honor. I don't have the — the excerpts of record. I just have the administrative record. That was my question. Oh, okay. That was at page — the 1996 reports are at page 196. Specifically at page 171 and 174 was talking about the faked encounter killings. And according to that, 1991 to 1992 was the major antiterrorist campaign. But by mid-1993, there were not — these killings and disappearances were just not happening anymore. And I'd also point the Court to the 1997 addendum at page 164, which talks about there's no evidence that Sikhs or Sikh particulars are facing harassment or mistreatment or persecution in the Punjab. There's the — the Sikhs associated with separatist movements may be detained and questioned. They could be charged and prosecuted for things such as Petitioner may possibly have been involved in with — with either assisting terrorists or — or persecuting Sikhs either way. So he — you know, there may be the prospect that he could be questioned on that and possibly charged, but that would not be torture or persecution if it's a legitimate government purpose for that questioning. Okay. Thank you. Thanks. We'll give you a minute for — two minutes for the bottle. Thank you. Just briefly, for the Court's information and reference, at AR-86, Petitioner testified as to the name of another subject of one of his investigations, a Gurmeet Singh. And again, Your Honor, beginning at AR-66 through 67 and 68, I believe, Petitioner was very detailed as to his background and experience with this agency. And he volunteered the name of the founder of the agency, two of the leaders, early leader and subsequent leader, after he had left and fled India. And again, he testified as to his training, his assignments, various assignments geographically. And this all points to detailed, plausible, consistent testimony as to his background. With respect to corroborating evidence, again, I would submit that the nature of his work militates against him providing employment verification, if you will, or some other form of documentation to corroborate his testimony. And we submit that it's not needed because his testimony was very detailed in that respect. And we'll submit it on that basis. Thank you, counsel. I want to thank both of you for rearranging your schedule. We did want to hear oral argument in this case because it's a bit unusual, to say the least. So we appreciate you rearranging your schedule so we could hear oral argument. Thanks. The case is heard and will be submitted and will be in recess.
judges: B. Fletcher, Noonan, Thomas